**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AT AUSTIN**

KIMBERLY STARLING, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NETWORTH REALTY, USA, LLC

DALLAS METRO HOLDINGS LLC

NETWORTH REALTY OF DALLAS/FORT WORTH, LLC a/k/a NETWORTH REALTY OF DALLAS, LLC

TIM BALL

AND SYNERGY DATA GROUP, S.A D/B/A "HOME FINDERS NETWORK"

Defendants.

Case No.

**1:26-CV-00410-RP**

**JURY TRIAL DEMANDED**

**PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff Kimberly Starling ("Plaintiff") by her undersigned counsel, for this class action complaint against Defendants NetWorth Realty, USA, LLC ("Defendant NetWorth"), Dallas Metro Holdings LLC ("Defendant Metro Holdings"), NetWorth Realty of Dallas/Fort Worth, LLC, also known as NetWorth Realty of Dallas, LLC ("Defendant NetWorth DFW"), Tim Ball ("Defendant Ball" or "Mr. Ball"), and Synergy Data Group, S.A., doing business as "Home Finders Network" ("Defendant Home Finders Network" or "HFN") (collectively, "Defendants"), as well as their present, former and future direct and indirect parent companies, subsidiaries, affiliates, agents and related entities, alleges as follows:

## I. INTRODUCTION

1. Nature of Action: "Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers,' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms,' *id.* § 2(9)." Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 649 (4th Cir. 2019).

2. "[T]he law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. *See id.*; 16 C.F.R. § 310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.'). . . . [P]rivate suits can seek either monetary or injunctive relief. [47 U.S.C. § 227(c)(5)]. . . . This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people. The law empowers each person

to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Id*. at 649-50.

3. Plaintiff, individually and as class representative for all others similarly situated, brings this action against Defendants for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") for making telemarketing calls to numbers on the National Do Not Call Registry, including her own.

4. Because telemarketing campaigns generally place calls to thousands or even millions of potential customers *en masse*, Plaintiff brings this action on behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of Defendants.

## II. PARTIES

5. Plaintiff Starling is an individual who resides in Texas.

6. Defendant NetWorth is a limited liability company with its registered agent in Austin, Travis County, Texas.

7. Defendant Metro Holdings is an affiliated company with Defendant NetWorth, with its registered agent in Austin, Travis County, Texas.

8. Defendant NetWorth DFW is a Texas limited liability company that operates a licensed real estate brokerage under the name "NetWorth Realty of Dallas," holding Texas Real Estate Commission ("TREC") broker license No. 587060, with its principal office at 5014 McKinney Avenue, Suite 300, Dallas, Texas 75205. The existing Defendants have referred to this entity variously as "NetWorth Realty of Dallas/Fort Worth, LLC," "Net Worth Realty of Dallas-Fort Worth, LLC," and "NetWorth Realty of Dallas, LLC." Upon information and belief, each of these names refers to the same entity. To the extent any of these names refers to a

separate legal entity, Plaintiff names and sues each such entity, and each is included within the term "Defendant NetWorth DFW."

9. Defendant Tim Ball is an individual who, upon information and belief, resides in Plano, Collin County, Texas. Mr. Ball is a licensed Texas real estate sales agent, TREC license No. 633003, who at all relevant times held himself out as a "Senior Acquisition Associate" of "NetWorth Realty of Dallas."

10. Defendant Synergy Data Group, S.A., doing business as "Home Finders Network," is an entity which places outbound telemarketing calls under the fictitious name "Home Finders Network" or "The Home Finders Network" and holds itself out through the website thehomefindersnetwork.com. Upon information and belief, Defendant Home Finders Network operates, in whole or in part, from Panama at the address Av. Balboa, Ph Yoo & Arts, Piso 49, Oficina 49A, Ciudad de Panama, 0, Panama, including under additional fictitious names, including "Lamassu Media," and directs its telemarketing calls into Texas. Although Plaintiff served discovery seeking the identity and role of "Home Finders Network," the existing Defendants have identified it only by a website and a generic email address, while simultaneously disclaiming any relationship with it.

## III. JURISDICTION AND VENUE

11. Jurisdiction. This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. 47 U.S.C. § 227; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

12. This Court has supplemental jurisdiction over Plaintiff's claims under the Texas Business and Commerce Code pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same telemarketing calls, and form part of the same case or controversy, as Plaintiff's TCPA claims.

13. Personal Jurisdiction: This Court has personal jurisdiction over Defendants. The Court has general personal jurisdiction because their headquarters and principal places of business are in Texas. Defendants NetWorth DFW and Ball likewise reside in and are domiciled in Texas. The Court has specific personal jurisdiction over Defendant Home Finders Network because it purposefully directed the telemarketing calls at issue to a Texas resident at a Texas telephone number, for the purpose of soliciting the sale of Texas real property and Texas real estate services, and Plaintiff's claims arise out of those Texas-directed calls.

14. Venue: Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because all the Defendants are residents of Texas and Defendants "reside" in Travis County, Texas, which lies within this District. To the extent Defendant Home Finders Network is not a resident of the United States, it may be sued in any judicial district, and its joinder is disregarded in determining where this action may be brought with respect to the other Defendants. 28 U.S.C. § 1391(c)(3).

## IV. FACTS

### A. The Enactment of the TCPA and its Regulations

15. In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding certain telemarketing practices.

16. Section 227(c) of the TCPA requires the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

17. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

18. A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

19. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are made. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

**B. The TCPA Also Requires Telemarketers to Transmit Caller Identification Information Including the Telemarketer's Name.**

20. The TCPA requires any "person or entity that engages in telemarketing" to "transmit caller identification information." 47 C.F.R. § 64.1601(e).

21. The relevant regulation defines "caller identification information" as "either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer." 47 C.F.R. § 64.1601(e)(1).

22. A violation of this subsection of the TCPA is enforceable under the private right of action provided for under 47 U.S.C. § 227(c)(5)'s private right of action. *Dobronski v. Selectquote Ins. Servs.*, No. 2:23-CV-12597, 2025 WL 900439, at *3 (E.D. Mich. Mar. 25, 2025).

**C. The Texas Business and Commerce Code**

23. Realizing the particular harm to Texas residents that unsolicited telemarketing calls to them poses, the Texas Legislature passed Section 302.101 of the Texas Business and Commerce Code, which requires all "sellers" or "salespersons" making "telephone solicitations" inducing a person to "purchase, rent, claim, or receive an item," to register as such with the Texas Secretary of State. TEX. BUS. & COM. CODE §§ 302.001; 302.101.

24. Under the Code, a "telephone call" includes both voice calls and text message calls, including visual messages. *Id.* § 304.002(10).

25. The burden of proof lies on Defendant to show it registered each business location to prove its licensure or on proving an exemption. *Id.* § 302.051.

26. The sale of real estate brokerage services is not a product or service for which there is an exemption to the Code. *Id.* § 302.051, 301.053.

**D. Unsolicited Telemarketing to Plaintiff**

27. Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

28. Plaintiff's telephone number, (817) XXX-XXXX, is a telephone number that is used for residential purposes.

29. Plaintiff uses the telephone number for her own personal, residential, and household needs and reasons.

30. The number is a residential telephone line because it is assigned to a telephone exchange service for consumers and is not assigned to a telephone exchange service for businesses.

31. Plaintiff's number has been on the National Do Not Call Registry for years since she registered it on the Registry, well prior to receiving the calls at issue.

32. Despite that, Plaintiff received at least two telemarketing calls from the same telephone number (469) 212-1831 in June 2025.

33. The first call came on June 5, 2025. This call resulted in a voicemail being left that had call center noise and typing audible in the background.

34. The Plaintiff did not ask for any additional calls.

35. Despite this, the Plaintiff received another call from the Defendants on June 9, 2025, from the same Caller ID.

36. The caller stated that they were from the illegally and fictitiously named "Home Finders Network."

37. After taking down the Plaintiff's information and gauging her interest, the caller, who was unnamed, said he would transfer the call to his real estate agent.

38. Plaintiff was then transferred to Tim Ball from NetWorth Realty of Dallas, who is a real estate agent.

39. Mr. Ball attempted to solicit services for eviction and buying a new home, in addition to listing or selling the Plaintiff's property.

40. Mr. Ball then sent the Plaintiff a proposed purchase agreement purporting to represent Defendant Metro in the purchase of the property.

41. Upon information and belief, Mr. Ball would receive a commission on Defendant Metro's proposed purchase.

42. None of the aforementioned Defendants are registered as telephone solicitors with the Texas Secretary of State.

43. Because they were sent to encourage the purchase of real estate services, including Mr. Ball's brokerage services through Net Worth, the calls were telemarketing.

44. The calls all came from the following number. Counsel for the Plaintiff has access to "dip" the Caller ID database of the calling carrier to ascertain the CNAM information to ascertain (1) whether caller name delivery (CNAM) is available with the Defendants' calling carrier, and (2) whether such CNAM information contained the name of the telemarketer. The results of those dips are as follows:

| Number | CNAM Available? | CNAM Result | Carrier |
|---|---|---|---|
| 4692121831 | Y | GRAND PR TX | Five9 |

45. As the aforementioned chart shows, the CNAM transmitted by the ultimate telephone carrier, Five9, provided CNAM functionality, but provided inaccurate CNAM functionality, since it provided a geographic location instead of the caller's or telemarketer's name.

46. The carrier Five9 provides their customers the ability to set the CNAM result accurately to reflect their own name as desired, but if the customer does not elect such a CNAM, their default CNAM customer setting is to transmit the geographic location of the telephone exchange for the calling telephone number, and not the caller's name, as occurred here.

47. A reasonable seller would investigate into the reasons why they would be sending calls to numbers on the National Do Not Call Registry.

48. Plaintiff's privacy has been violated by the above-described telemarketing calls/text messages.

49. Plaintiff never provided her consent or requested these calls.

50. In fact, the Plaintiff never did any business whatsoever with any of the Defendants.

51. The aforementioned calls that were made to the Plaintiff were unwanted.

52. The calls were non-consensual encounters.

53. Plaintiff and all members of the Class, defined below, have been harmed by the acts of Defendants because their privacy has been violated and they were annoyed and harassed.

**E. The Relationships Between and Among the Defendants**

54. The calls at issue were not the work of a single, isolated actor. They were the product of an integrated residential real estate operation, conducted under the "NetWorth Realty" brand and under the common ownership and control of Mark Bloom, in which each Defendant played a defined role: Defendant Home Finders Network placed the calls and screened homeowners; Defendant Ball received the transferred calls and solicited the homeowners; Defendant NetWorth DFW sponsored, supervised, and stood to be paid for Mr. Ball's brokerage activity; Defendant NetWorth supplied the brand, the lead-data software, and the policies governing that activity; and Defendant Metro Holdings was the buyer represented by Mr. Ball that sought to acquire Plaintiff's property.

55. Defendant NetWorth operates the "NetWorth Realty" brand and the website networthrealtyusa.com, on which it maintains a page for "NetWorth Realty of Dallas" and advises consumers that submitting an inquiry permits "NetWorth Realty USA and its affiliated companies" to contact them by phone, text, or email.

56. Defendant NetWorth has admitted in discovery that it provides its "licensees," including Defendant NetWorth DFW, with access to NetWorth's proprietary "CASH" system, and that a NetWorth employee is responsible for managing the technical aspects of the CASH system licensed to those entities. NetWorth's own user agreement describes the CASH system as software offered to brokers and agents "for the purpose of accessing data about potential leads."

57. Defendant NetWorth has further admitted that it provides its licensees, including Defendant NetWorth DFW, with "Company Policies & Procedures," which Defendant NetWorth DFW in turn provides to its sales associates. Those policies govern the sales associates' electronic marketing and solicitation, "including, but not limited to, email, fax and telephone";

require sales associates to comply with the sponsoring broker's "Cold Calling Policy"; and require sales associates to obtain the broker's written approval before using any assumed name or publishing any advertising.

58. Defendant NetWorth thus sets the rules under which NetWorth-branded agents prospect for sellers by telephone, supplies the lead data those agents use, and monitors their use of it. Indeed, NetWorth has represented in discovery its understanding that, when Mr. Ball contacted Plaintiff, he did so without using the CASH system, a representation that presupposes NetWorth's ability to monitor its agents' prospecting activity.

59. NetWorth's records reflect that Mr. Ball accepted a NetWorth user agreement on October 30, 2024. NetWorth's CASH user agreement expressly contemplates that NetWorth-affiliated agents will use NetWorth's lead data to solicit prospects, and it purports to make the agent responsible for any claims asserted against the agent "or The Company" for violating "do not call" rules or the National Do Not Call Registry. NetWorth therefore knew that its agents solicit homeowners by telephone and anticipated that such solicitation would generate do-not-call claims against NetWorth itself.

60. Defendant NetWorth has identified Mark Bloom as "an officer, member, and/or manager" of Defendant NetWorth, of Defendant Metro Holdings, and of Defendant NetWorth DFW, with personal knowledge of "NetWorth and its affiliates' corporate structures and relationships." Mr. Bloom provided the information used to answer the interrogatories of both Defendant NetWorth and Defendant Metro Holdings in this case. Mr. Bloom is also the designated broker for Defendant NetWorth DFW's brokerage license and uses a networthrealtyusa.com email address.

61. Defendant Metro Holdings is a Texas limited liability company owned and managed by Mark Scott Bloom and Amy Elizabeth Bloom. Its registered office and principal place of business is the same address from which Defendant NetWorth DFW and Mr. Ball operate.

62. Defendant Metro Holdings contends that it "has no employees" and that its business activities "are limited to buying and selling real estate." Having no employees, Metro Holdings can locate, negotiate for, and contract to acquire properties only through licensed real estate agents like Mr. Ball.

63. In June 2023, by a resolution executed by Mr. Bloom, Defendant Metro Holdings designated Ray Albers, Defendant NetWorth DFW's general manager and Mr. Ball's licensed supervisor, as an authorized signatory to execute contracts and other instruments for the purchase and sale of real property on Metro Holdings' behalf.

64. Mr. Ball is a sales associate sponsored by Defendant NetWorth DFW under a Texas Realtors Independent Contractor Agreement for Sales Associate, which Mr. Bloom executed as broker.

65. Under that agreement, Mr. Ball agreed, among other things: to use his best efforts to "solicit listings and prospects for Broker's real estate business"; to perform his services "exclusively for Broker"; that all fees and compensation for brokerage services "are payable to and belong to Broker"; that all agreements he procures must be taken in the broker's name; that advertising, which the agreement defines to include "any written or oral statement which is intended to induce the public to use Associate's or Broker's services," may be placed only with the broker's knowledge and consent; that the broker retains the right to assign and reassign leads

and prospects; and that the broker may terminate the relationship at any time, with or without cause.

66. Mr. Ball also executed a Brokerage Policies and Procedures Acknowledgment and Agreement, by which he agreed to abide by the policies and procedures of "NetWorth Realty of Dallas," including the policies described above governing telephone solicitation and cold calling.

67. Texas law independently obligates Defendant NetWorth DFW, as Mr. Ball's sponsoring broker, to supervise his brokerage activities, and makes a broker liable to the public for conduct engaged in by a sales agent associated with or acting for the broker. *See* Tex. Occ. Code § 1101.803; 22 Tex. Admin. Code § 535.2.

68. Mr. Ball held himself out, and was held out by Defendants NetWorth and NetWorth DFW, as a NetWorth agent. His email signature identified him as a "Senior Acquisition Associate" with "NetWorth Realty of Dallas, LLC," used a networthdfw.com email address, and displayed the NetWorth Realty logo along with links to NetWorth Realty's website and social media accounts.

69. Defendant NetWorth publicly claimed Mr. Ball as its own. In a June 2024 Facebook post, "NetWorth Realty USA" congratulated "our Sr. Acquisition Associate, Tim Ball," "[f]rom our NetWorth Realty of Dallas office," as "the company's Agent of the Month," and invited the public to contact him.

70. NetWorth Realty's Instagram account likewise promoted Mr. Ball as "the 11-year tenured Sr. Acquisition Associate at NetWorth Realty of Dallas," and invited anyone "buying or selling" to contact him.

71. On June 10, 2025, the day after the June 9, 2025 call, Mr. Ball sent Plaintiff a TREC-promulgated purchase contract naming Defendant Metro Holdings as the buyer of Plaintiff's property for $900,000 in cash, and designating Mr. Ball's own telephone number and networthdfw.com email address as the contact information for all notices "To Buyer."

72. The contract's broker information section identified Defendant NetWorth DFW, as "NetWorth Realty of Dallas, LLC," license No. 587060, as the brokerage in the transaction, Mr. Ball as its associate, and Mr. Albers as Mr. Ball's licensed supervisor.

73. The contract further disclosed that the buyer, Defendant Metro Holdings, is owned in whole or in part by licensed broker Mark Bloom.

74. Mr. Ball also provided Plaintiff with Metro Holdings' entity formation documents and a proof-of-funds letter in support of Metro Holdings' ability to close.

75. Defendant Metro Holdings has likewise acknowledged in discovery that Mr. Ball "communicated with Plaintiff about selling her property and forwarded a proposed contract in which [Metro Holdings] was the buyer."

76. Upon information and belief, Defendant Home Finders Network is a lead generator that places outbound telemarketing calls *en masse* to homeowners, screens them as prospective sellers, and transfers the homeowners who meet specified criteria, by live telephone transfer, to real estate agents, such as Mr. Ball, who then solicit those homeowners.

77. That is what occurred here. Home Finders Network's representative took down Plaintiff's information and gauged her interest, asking whether she owned the property, its square footage, its condition and age, and her timeline for selling, before transferring the call to "his real estate agent," Mr. Ball.

78. The transfer was seamless. When the call was transferred, Mr. Ball already had Plaintiff's information, addressing her by her surname and knowing her property's location, which demonstrates that Home Finders Network passed Plaintiff's information to Mr. Ball as part of the transfer.

79. At no point was Plaintiff given any indication that she was dealing with multiple, independent entities. From Plaintiff's perspective, the June 9, 2025 call was a single, continuous telemarketing transaction, moving without interruption from Home Finders Network's representative, to Mr. Ball as the "real estate agent," and culminating the next day in a written offer from Defendant Metro Holdings.

80. Upon information and belief, Mr. Ball and/or Defendant NetWorth DFW compensated Home Finders Network for the live call transfers and/or leads it generated, and Home Finders Network placed the calls at issue, including the calls to Plaintiff, for the purpose of generating such transfers to Mr. Ball.

81. Both Defendant NetWorth and Defendant Metro Holdings have stated in discovery that Mr. Ball "may have worked with" or "utilized" Home Finders Network to contact Plaintiff. By Defendants' own account, therefore, Mr. Ball sourced Plaintiff as a prospect through Home Finders Network's outbound calling, rather than through NetWorth's own lead system.

**F. Defendants' Irreconcilable Positions Regarding Mr. Ball and Home Finders Network**

82. Despite the foregoing, Defendants NetWorth and Metro Holdings have attempted in discovery to distance themselves from both Mr. Ball and Home Finders Network. Defendant NetWorth now describes Mr. Ball as a "third-party" and as "an independent contractor of non-party NetWorth DFW," and denies any relationship with Home Finders Network. Defendant

Metro Holdings denies that it employed Mr. Ball or had "any contractual relationship with him with respect to Plaintiff's property," despite the fact that Mr. Ball was the agent purportedly representing Metro Holdings in the purchase of the Plaintiff's property.

83. The existing Defendants have not even consistently identified the NetWorth entity with which Mr. Ball is affiliated, variously naming it "NetWorth Realty of Dallas/Fort Worth, LLC," "Net Worth Realty of Dallas-Fort Worth, LLC," and "NetWorth Realty of Dallas, LLC." And both existing Defendants identified "The Home Finders Network" in their initial disclosures only by a website and a generic email address, without identifying the person or entity that operates it.

84. These disclaimers cannot be squared with Defendant NetWorth's public promotion of Mr. Ball as "our" agent and "the company's Agent of the Month"; with the common ownership, management, personnel, and offices shared by Defendants NetWorth, NetWorth DFW, and Metro Holdings, with Mr. Ball's own statement that Metro Holdings is the entity used to purchase properties, or with Metro Holdings' characterization of Mr. Ball as its agent. Plaintiff therefore joins Defendants NetWorth DFW, Ball, and Home Finders Network so that every participant in the calls is before the Court, and, to the extent necessary, pleads their respective roles in the alternative. Fed. R. Civ. P. 8(d)(2)-(3).

### G. Defendants Are Directly and Vicariously Liable for the Calls

85. The TCPA provides a private right of action against the person that makes a call in violation of the do-not-call regulations and against the person "on whose behalf" such a call is made. 47 U.S.C. § 227(c)(5). For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate

responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

86. In 2013, the FCC held that a seller that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers," including under principles of actual authority, apparent authority, and ratification. *In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013). The FCC explained that "allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions." *Id.* at 6588 ¶ 37; *see also Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016).

87. A person may also be directly liable under the TCPA where it takes the steps necessary to physically place a call, or is so involved in the placing of a call as to be deemed to have initiated it. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, ¶ 30 (2015). And an individual who personally participates in or directs conduct that violates the TCPA is personally liable for it. *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001).

88. Defendant Home Finders Network is directly liable for the calls at issue because it took the steps necessary to physically place them, including the June 5 and June 9, 2025 calls to Plaintiff from caller ID (469) 212-1831, which Home Finders Network placed through its carrier, Five9, without transmitting its name as the telemarketer.

89. Defendant Ball is directly liable because he personally made the telephone solicitation on the June 9, 2025 call after it was transferred to him, and because, as the agent who

procured, accepted, and, upon information and belief, paid for Home Finders Network's call transfers, he was so involved in the placing of the calls as to be deemed to have initiated them.

90. Mr. Ball is also vicariously liable for Home Finders Network's calls. Upon information and belief, Mr. Ball authorized Home Finders Network to call homeowners and to transfer to him those who met his criteria, and Home Finders Network's representative expressly identified Mr. Ball to Plaintiff as "his real estate agent." Mr. Ball ratified Home Finders Network's calls by knowingly accepting the transfer of Plaintiff's call and using it to solicit Plaintiff.

91. Defendant NetWorth DFW is vicariously liable for the calls. Mr. Ball acted with actual authority as NetWorth DFW's agent: NetWorth DFW authorized and required him to solicit prospects for NetWorth DFW's real estate business, controlled the manner and means of his telephone solicitation through its policies and procedures, including its cold calling and advertising policies, supervised him through a licensed supervisor; owned compensation he earned, retained the right to assign and reassign his leads, and retained the right to terminate him at will. NetWorth DFW is likewise liable for the calls placed by Home Finders Network as Mr. Ball's subagent.

92. Defendant NetWorth DFW is also liable under principles of apparent authority, because it cloaked Mr. Ball with the indicia of authority to act on its behalf, including its name, logo, license number, office address, telephone number, and email domain, on which Plaintiff reasonably relied in understanding that she was dealing with NetWorth Realty.

93. And NetWorth DFW ratified the calls. With knowledge of the manner in which Plaintiff had been contacted, including through Plaintiff's written notices of June 11 and June 17, 2025, which were addressed to Defendants NetWorth and NetWorth DFW and directed to Mr.

Ball, Mr. Albers, and Mr. Bloom, NetWorth DFW accepted the benefits of the calls by pursuing, as the brokerage of record, the purchase transaction the calls generated, and did not repudiate them.

94. Defendant NetWorth is vicariously liable for the calls. NetWorth supplies the brand under which Mr. Ball and NetWorth DFW solicit homeowners, the lead data software NetWorth affiliated agents use to do so, and the policies governing their telephone solicitation. It monitors its agents' use of its lead system, and it shares a common officer and manager, Mr. Bloom, with both NetWorth DFW and Metro Holdings.

95. Upon information and belief, NetWorth also receives licensing fees or other compensation from NetWorth DFW tied to NetWorth DFW's brokerage activity.

96. NetWorth also held Mr. Ball out to the public as "our" agent and "the company's Agent of the Month," inviting consumers to deal with him as a NetWorth agent, and Plaintiff understood that she was dealing with NetWorth Realty. Having received Plaintiff's written notices at its own networthrealtyusa.com addresses, NetWorth did not repudiate the calls.

97. Defendant Metro Holdings is vicariously liable for the calls, which were made on its behalf and for its benefit, to procure Plaintiff's property for purchase by Metro Holdings. Metro Holdings has no employees and acts only through agents like Mr. Ball. It furnished Mr. Ball with its formation documents, its proof of funds, and authority to tender a purchase contract in its name, with Mr. Ball designated as the contact for all notices to the buyer, and its own records identify Mr. Ball as the agent on the transaction.

98. Metro Holdings also ratified the calls and knowingly accepting their benefits, including by appointing Mr. Ball as its agent for the prospective purchase transaction.

99. Defendants NetWorth, NetWorth DFW, and Metro Holdings each knew that Mr. Ball was soliciting homeowners by telephone. Each had the right and the ability to prohibit agents like Mr. Ball from using third-party cold-calling lead generators such as Home Finders Network, to require that any such calls be placed only to numbers scrubbed against the National Do Not Call Registry and with accurate caller identification information, and to discipline or terminate agents and vendors who failed to comply.

100. None did so.

101. A reasonable seller or sponsoring broker whose agents obtain prospects through third-party outbound calling would investigate the manner in which those calls are generated.

102. Defendants did not, and instead accepted the benefits of the calls.

103. Upon information and belief, none of Defendants NetWorth DFW, Ball, or Home Finders Network holds a registration certificate from the Texas Secretary of State under Chapter 302 of the Texas Business and Commerce Code for any business location from which the telephone solicitations at issue were made.

104. In sum, Defendant Home Finders Network is directly liable as the entity that physically placed the calls at issue. Defendant Ball is directly liable as the agent who was so involved in the calls as to be deemed their initiator and who personally made the telephone solicitation, and is vicariously liable for the calls Home Finders Network placed on his behalf. Defendant NetWorth DFW is vicariously liable as Mr. Ball's sponsoring broker and principal, and for the conduct of Home Finders Network as Mr. Ball's subagent. Defendant NetWorth is vicariously liable as the principal that branded, equipped, set the rules for, and held out the agents who made the calls. And Defendant Metro Holdings is vicariously liable as the buyer on

whose behalf, and for whose benefit, the calls were made. Each Defendant is jointly and severally liable for each call.

## V. CLASS ACTION ALLEGATIONS

105. Class Definition. Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiff brings this case on behalf of the Classes (the "Class") defined as follows:

> **National Do Not Call Registry Class**: All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from or on behalf of a Net Worth Realty agent, (3) within a 12-month period, (4) at any time in the period that begins four years before the date of filing this Complaint to trial.
>
> **National Do Not Call Registry Metro SubClass**: All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from or on behalf of a Net Worth Realty agent, for a property to be purchased by or services performed by Metro, (3) within a 12-month period, (4) at any time in the period that begins four years before the date of filing this Complaint to trial.
>
> **Telemarketing Caller ID Class:** All persons within the United States to whom: (1) Defendants (or a third-party acting on behalf of Defendants) sent (2) two or more telemarketing calls in a 12-month period, (3) which either (a) did not transmit caller identification information that included either CPN or ANI and the Defendants' or telemarketer's name, (b) did not transmit a valid CPN or ANI at all, or (c) transmitted a CPN or ANI that would not have allowed an individual to make a do not call request to Defendants during regular business hours, (4) within the four years prior to the filing of the Complaint.
>
> **Texas Business and Commerce Code Class:** All persons in the State of Texas who (1) received a telephone solicitation call from or on behalf of Defendants, (2) at any time during which Defendants were not registered as telephone solicitors with the Texas Secretary of State, (3) at any time in the period that begins four years before the date of filing this Complaint to trial.

106. Excluded from the Classes are counsel, Defendants, any entities in which Defendants have a controlling interest, Defendants' agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

107. The Classes, as defined above, are identifiable through telephone records and telephone number databases.

108. The potential members of the Classes likely number at least in the hundreds because of the *en masse* nature of telemarketing calls.

109. Individual joinder of these persons is impracticable.

110. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

111. Plaintiff is a member of the Classes and will fairly and adequately represent and protect the interests of the Classes as she has no interests that conflict with any of the class members.

112. Plaintiff and all members of the Classes have been harmed by the acts of Defendants, including, but not limited to, the invasion of their privacy, annoyance, waste of time, and the intrusion on their telephone that occupied it from receiving legitimate communications.

113. This class action complaint seeks injunctive relief and money damages.

114. There are numerous questions of law and fact common to Plaintiffs and members of the Classes. These common questions of law and fact include, but are not limited to, the following:

a. Whether Defendants systematically made multiple telephone calls to members of the National Do Not Call Registry Class;

b. whether Defendants transmitted CPN or ANI and their name in the caller ID information, when provided as an option by their telephone carrier, to Plaintiff and members of the Telemarketing Caller ID Class;

c. whether Defendants were appropriately registered as telemarketers under the Texas Business and Commerce Code;

d. whether Defendants made calls to Plaintiff and members of the National Do Not Call Registry Class without first obtaining prior express written consent to make the calls; and

e. whether members of the Classes are entitled to treble damages based on the willfulness of Defendants' conduct.

115. Plaintiff's claims are typical of the claims of the Classes, as they arise out of the same common course of conduct by Defendants and are based on the same legal and remedial theories.

116. Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Classes, she will fairly and adequately protect the interests of the Classes, and she is represented by counsel skilled and experienced in class actions, including TCPA class actions.

117. Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendants and/or their agents.

118. A class action is the superior method for the fair and efficient adjudication of this controversy. Class-wide relief is essential to compel Defendants to comply with the TCPA. The interests of individual members of the Classes in individually controlling the prosecution of separate claims against Defendants are small because the damages in an individual action for

violation of the TCPA are small. Management of these claims is likely to present significantly more difficulties than are presented in many class claims. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. There will be no significant difficulty in the management of this case as a class action.

119. Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief and corresponding declaratory relief with respect to the Classes appropriate on a class-wide basis. Moreover, on information and belief, Plaintiff alleges that the telephone solicitation calls made by Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf that are complained of herein are substantially likely to continue in the future if an injunction is not entered.

## FIRST CAUSE OF ACTION
**Telephone Consumer Protection Act**
**Violations of 47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(c)**
**(On Behalf of Plaintiff and the National Do Not Call Registry Class)**

120. Plaintiff repeats the prior allegations of this Complaint and incorporates them by reference herein.

121. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by making telemarketing calls, except for emergency purposes, to Plaintiffs and members of the National Do Not Call Registry Class despite their numbers being on the National Do Not Call Registry.

122. Defendant Home Finders Network is directly liable for these violations as the entity that physically initiated the calls. Defendant Ball is directly liable because he personally

made the telephone solicitation on the June 9, 2025 call and was so involved in the placing of the calls as to be deemed to have initiated them, and he is also vicariously liable for the calls placed by Home Finders Network. Defendants NetWorth DFW, NetWorth, and Metro Holdings are vicariously liable for the calls, which were made on their behalf by their actual and apparent agents and subagents, and which they ratified.

123. Defendants' violations were negligent, willful, or knowing.

124. As a result of Defendants', and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf, violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the National Do Not Call Registry Class are presumptively entitled to an award of between $500 and $1,500 in damages for each call made.

125. Plaintiff and the members of the National Do Not Call Registry Class are also entitled to and do seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making telemarketing calls to telephone numbers registered on the National Do Not Call Registry, except for emergency purposes, in the future.

## COUNT II
**Violations of the TCPA, 47 U.S.C. § 227**
**(On Behalf of Plaintiff and the Telemarketing Caller ID Class)**

126. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

127. It is a violation of the TCPA to make a telemarketing call without the transmission of caller identification information including either a CPN or ANI and, when available by the telemarketer's carrier, the name of the telemarketer. 47 C.F.R. § 64.1601(e)(1).

128. It is a violation of the TCPA to transmit a CPN or ANI that does not allow any individual to make a do-not-call request during regular business hours. 47 C.F.R. § 64.1601(e)(1).

129. Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf violated the TCPA by causing multiple telemarketing calls to be initiated to Plaintiff and members of the Telemarketing Caller ID Class in a 12-month period, without transmitting the name of the telemarketer, despite such option for transmission of accurate CNAM information being available by its carrier, and/or without proving a CPN or ANI that allowed any individual to make a do-not-call request during regular business hours.

130. Defendant Home Finders Network, which placed the calls through its carrier Five9 without transmitting its name as the telemarketer despite the availability of accurate CNAM functionality, is directly liable for these violations, and Defendants Ball, NetWorth DFW, NetWorth, and Metro Holdings are directly and/or vicariously liable for them for the reasons alleged above.

131. These violations were willful or knowing.

132. As a result of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf's violations of the TCPA's telemarketing Caller ID transmission requirement, Plaintiff and members of the Telemarketing Caller ID are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

133. Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

## <u>COUNT III</u>
## Violations of Texas Business and Commerce Code § 302.101
## (On Behalf of Plaintiff and the Texas Business and Commerce Code Class)

134. Plaintiff repeats the prior allegations of this Complaint and incorporates them by reference herein.

135. The foregoing acts and omissions of Defendants constitute numerous and multiple violations of the Texas Business and Commerce Code, § 302.101, by making telephone solicitation calls, to Plaintiff and members of the Texas Business and Commerce Code Class despite not holding a registration certificate for the business location from which the telephone solicitation is made.

136. Each Defendant is a "seller" or "salesperson" within the meaning of Tex. Bus. & Com. Code § 302.001, or is otherwise liable for the telephone solicitations made on its behalf by its salespersons and agents, and, upon information and belief, none held a registration certificate under § 302.101 for the business location from which the telephone solicitations at issue were made.

137. Defendants' violations were negligent, willful, or knowing.

138. As a result of Defendants' violations of the Texas Business and Commerce Code, § 302.101, Plaintiff and members of the Texas Business and Commerce Code Class are presumptively entitled to a civil penalty of $5,000 for each violation under § 302.302, plus all reasonable costs of prosecuting the action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

A. Certification of the proposed Classes;

B. Appointment of Plaintiff as representative of the Classes;

C. Appointment of the undersigned counsel as counsel for the Classes;

D. An order enjoining Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making telemarketing calls to numbers on the National Do Not Call Registry, absent an emergency circumstance, or while failing to transmit the caller ID information required by law;

E. An award to Plaintiff and the Classes of damages, as allowed by law, for which Defendants are jointly and severally liable; and

F. Orders granting such other and further relief as the Court deems necessary, just, and proper.

## VI. DEMAND FOR JURY

Plaintiff demands a trial by jury for all issues so triable.

RESPECTFULLY SUBMITTED AND DATED this September 25, 2026.

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

*Attorney for Plaintiff and the Proposed Class*